## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| | : | |
| THE CITY OF ATLANTIC CITY, | : | |
| | : | |
| Plaintiff, | : | Civil No. 14-5169 (RBK/AMD) |
| v. | : | |
| | : | **OPINION** |
| ZEMURRAY STREET CAPITAL, LLC; W. | : | |
| Wesley DRUMMON; TENNESSEE | : | |
| BUSINESS & INDUSTRIAL | : | |
| DEVELOPMENT CORPORATION d/b/a TN | : | |
| BIDCO; Gary A. LAX; Michael J. LAX; | : | |
| LANTANA FAMILY TRUST 1; TAIPAN | : | |
| HOLDINGS, LLC; *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KUGLER**, United States District Judge:

This is a cautionary tale in why due diligence is so important and why parties to million-dollar contracts should go through the trouble of defining the terms governing their agreements. After years of litigation, this Court now considers the Motion for Summary Judgment of Plaintiff City of Atlantic City (the "City") (Doc. No. 137), and Defendants Zemurray Street Capital, LLC ("Zemurray") and W. Wesley Drummon's Response (Doc. No. 148) and the City's Reply (Doc. No. 165) thereto. Also before the Court is the Cross-Motion for Summary Judgment of Defendants Gary Lax, Lantana Family Trust 1 (the "Lantana Trust"), and TN BIDCO (collectively, the "Lax Defendants") (Doc. No. 158). The Lax Defendants have also filed a Motion to Strike (Doc. No. 158).

The City has brought claims of breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), fraud (Count Three), conversion (Count

Four), fraudulent transfer (Count Seven), and fraudulent concealment (Count Eight), and has moved for summary judgment on all but the fraudulent concealment claim. It has also sought, as a remedy, to impose liability on Defendants under a veil-piercing theory (Count Six). In its cross-motion, the Lax Defendants have challenged many of the exhibits presented by the City and have also filed their own summary judgment motion on all of the counts in the complaint.

## I.    THE FACTS

### A.  The Loan Program

Zemurray Street Capital, LLC is a Delaware limited liability company. The company's ownership is divided. Since the time of the events at issue, W. Wesley Drummon has had a 50% ownership interest in Taipan Holdings, LLC, which itself has a 50% controlling interest in Zemurray. (Drummon Dep. 8:12-14.) The Lantana Trust owns the other 50% of Zemurray. (*Id.*) Drummon also indicated that Gary Lax exercises some degree of control over the Trust. (*Id.*) But because Lax has exercised his rights to the Fifth Amendment due to ongoing and related criminal proceedings, and because the parties have not presented conclusive documentation on the matter, the scope of his control of the Lantana Trust is unclear.[1] Whatever the dimensions of its ownership, though, it is clear that both Drummon and Gary Lax were corporate officers with the authority to "act, negotiate, enter into, and execute in the name and on behalf of [Zemurray], any agreements, documents, instruments, certificates and other commitments and obligations" that they deemed to

---

[1] *See* Lax Dep. at 8:1-9:

| | |
|---|---|
| **Q** | Okay. Prior to May of 2013 did you, Gary Lax, personally, have any interest in Zemurray Street Capital, LLC? |
| **A** | I'm gonna take the Fifth. |
| **Q** | Did you have any interest in any entity that had an interest in Zemurray Capital before May of 2013? |
| **A** | The Fifth. |

be in the best interests of Zemurray. (*See* Nov. 21, 2013 Consent to Authorization, Trenk Cert. Ex. V.)

In July of 2012, the City began discussions with Drummon about implementing a residential lending program (the "Lending Program") for the City. (Trenk Cert. Ex. A.) Some time after, Drummon submitted an initial program proposal for the Lending Program to the City. (Trenk Cert. Ex. B.) After some back and forth, Drummon sent an email of an "investment proposal" for the Lending Program. (Trenk Cert. Ex C.)

The investment proposal stated that "Zemurray Street Capital Corporation"[2] sought $3 million from the City to invest in a loan fund (the "Loan Fund"), and would invest this $3 million along with a $25 million credit facility "currently being negotiated between ZSCC and Amalgamated Bank for the purpose of originating guaranteed government loans," such as Small Business Administration ("SBA") loans. (Trenk Cert. Ex. C.) The proposal for the $3 million posited that it would grow and provide the funding for the loans. It would be used to create "sub-advisor" relationships for the Lending Program. And it would be used to enable Zemurray to "contract with" the Tennessee Business & Industrial Development Corporation, known as TN BIDCO, to provide the lending for the Lending Program. (*Id.*) The proposal also represents that Zemurray would underwrite $40 million in SBA and mortgage loans. (*Id.*) Drummon's proposal, submitted on behalf of Zemurray, also posited that "[b]ased on conservative projected income,

---

[2] Defendants argue, repeatedly, that Zemurray Street Capital Corporation does not refer to Zemurray Street Capital, LLC. This difference permeates the documents submitted to the Court. But Defendants' efforts to distinguish the two are misguided and wrong. As put by Drummon himself, with regard to this apparent error, "[i]t should say 'Zemurray Street Capital, LLC,' not 'Zemurray Street Capital Corporation.'" (Def. Ex. B at 38.) We see no reason to doubt him.

[Zemurray] firmly believes that it will return the $3 million investment to the City within six months of funding." (*Id.*)

These terms were hashed out over the next couple months, with several people in the City reviewing the documents, including City counsel Michael Bonner, Esq. (Trenk Cert. at Ex. D; *see also* Def. Ex. B 1-15; Ex. C; Ex. D.) It was represented during the negotiation process that TN BIDCO would be "doing the lending," not Amalgamated Bank. (Trenk Cert. at Ex. E.) On April 29, 2013, Drummon was informed that the City's initial payment into the Loan fund would be $3 million, with $1.5 million for residential loans and $1.5 million to be used for commercial loans. (Trenk Cert. at Ex. F.) A draft contract was soon circulated.

### B. The Negotiations to Purchase TN BIDCO

Beginning in June of 2012, one month before proposing the Lending Program to the City, Drummon started negotiations with TN BIDCO's former Chief Executive Officer, Jim Thigpen, for Zemurray's purchase of all the outstanding stock of TN BIDCO. (Trenk Cert. at Ex. H; Thigpen Cert. at ¶ 5.) Thigpen asserts that during this time, Drummon disclosed that Gary Lax was interested in the acquisition. (Thigpen Cert. at ¶ 5.)

In January of 2013, concurrent to negotiations with the City and with TN BIDCO, Drummon submitted a Change of Control Application to the Tennessee Department of Financial Institutions (the "Department") for regulatory approval of Zemurray's proposed purchase of TN BIDCO. (Trenk Cert. at Ex. I.) That application clearly indicates Gary Lax, as the trustee and grantor of the Lantana Trust, was a member of Zemurray Street Capital, LLC, along with three other individuals who shared the surname Lax. (*Id.* at Attach. 2.)

The Department sought clarification. In a letter to Drummon, it asked about "the source of funds for the purchase price of the BIDCO." (Trenk Cert. Ex. J.) It also stated that "according to

4

the new business plan, the BIDCO intends to originate residential real estate loans and consumer loans. This does not appear to be a permissible activity for a Tennessee BIDCO." (*Id.*) Drummon responded to the Department by stating that the funds to purchase TN BIDCO would be "[e]quity capital from the members of Zemurray Street Capital, LLC." (Trenk Cert. at Ex K.) Drummon further stated that he had amended the business plan to "remove any reference to residential mortgage and consumer loan origination." (*Id.*)

The Department again sought clarification on April 18, 2013. It asked about "the source of the cash funds used to pay the current shareholders" of TN BIDCO. (Trenk Cert. Ex. L.) The Department also advised that TN BIDCO was "prohibited from engaging in any residential mortgage origination activity." (*Id.*) It requested "current financial information on Zemurray" and "names of the executive/senior officers and directors of Zemurray." (*Id.*) Drummon responded to the Department by stating "[t]he source of capital used by Zemurray for the payment to existing shareholders is the proceeds from preferred units issued to members of the LLC." (Trenk Cert. Ex. M.) Drummon also stated that TN BIDCO would "only participate in residential mortgage loans that have already been originated," and "has no present plans to service residential mortgage loans where any direct contact with the consumer is anticipated." (*Id.*) Drummon later provided the Department with additional financial information and a list of Zemurray's members, which again included the Lantana Trust and Taipan Holdings. (Trenk Cert. Ex. N.) That information also stated that Zemurray's total liabilities and members equity totaled $5,637,681. (*Id.*) $3 million of that was "loan escrow receivable."

It appears—though the actual letter indicating approval was not presented to this Court—that the application to purchase TN BIDCO was approved by the Department, contingent on an initial capital injection of $5,000,000. At the request of Gary Hoyer, principal of National Asset

Managers (an entity that is, or at least was, a member of Zemurray), that sum was reduced to $3 million in August 2013. (Trenk Cert. Ex. O.) As we will see, that reduction is consistent with a decision by Atlantic City to reduce its own interest in the Lending Program to $3 million.

### C. The Contract with Atlantic City and the $3 Million Escrow Account

On May 22, 2013, the City adopted Resolution No. 450, authorizing execution of a Memorandum of Understanding (the "Contract") between Zemurray and the City. (Perugini Cert. Ex. A.) On May 31, 2013 the City executed the Contract with Zemurray. (Perugini Cert. Ex. B.)

The Contract's purpose is to establish the Loan Fund to assist City residents in obtaining: (a) financing for the creation of businesses; (b) residential mortgages and refinancing; and (c) financing for rehabilitation of housing stock in the City. (*Id.*) Under the Contract, Zemurray was to oversee implementation of the Loan Fund using TN BIDCO. "BIDCO has the lending expertise to carry out the purposes of this [Contract] and is designated as a preferred lender by the Small Business Administration." (*Id.*) The term of the Loan Fund was to be five years and thirty days from the date of contracting on May 31, 2013. (*Id.*) The money used to establish the Fund was to be returned within thirty days of the end of the term, i.e. by July 1, 2018. (*Id.*) Zemurray was to provide the Mayor's office within forty-five calendar days after the end of each calendar quarter with a report setting forth the use of the money in the Loan Fund pursuant to the purposes of the Contract. (*Id.*) Under the Contract, Zemurray agreed to "use" TN BIDCO, which would use SBA programs to originate small business loans. (*Id.*) Zemurray also stated that TN BIDCO would also originate residential loans, despite the Tennessee Department of Financial Institutions putting Zemurray on notice that TN BIDCO could not originate residential loans. (*Id.*)

The Contract provided that upon the execution of an escrow agreement (the "Escrow Agreement"), the City would deposit up to $5,000,000 in cash into the escrow account, with the

initial amount being no less than $3,000,000. (*Id.*) The Contract states that the money held in the escrow account "will be used to establish the Loan Fund and shall be released from escrow only pursuant to the terms of the escrow agreement." (*Id.*) If within six months of its establishment the Loan Fund was not fully funded by the City with the maximum $5,000,000, Zemurray would "reduce its estimates for aggregate lending under the Loan Fund" and provide new estimates to the Mayor's Office within thirty days after the close of the six-month period. (*Id.*) The Contract also provides that it "supersedes any and all prior agreements, written communications or understanding between the parties." (*Id.*) And it also states that "[a]ll disclosures and press releases regarding this [Contract] and the transactions contemplated hereunder shall be made solely by the City with the prior consent of [Zemurray]."[3] (*Id.*) The Contract was signed by Mayor Langford of Atlantic City, and by Drummon on behalf of Zemurray. (*Id.*)

In conjunction with the execution of the Contract, the City applied for approval of the Lending Program with the New Jersey Department of Community Affairs on June 18, 2013, which granted partial approval for the Lending Program, with a maximum funding limit of $3,000,000. (Trenk Cert. Ex. P.) On July 11, 2013, the City Council adopted Ordinance No. 35, authorizing the establishment of the $3,000,000 Loan Fund. (Perugini Cert. Ex. C.) The City and Zemurray then executed the Escrow Agreement. (Perugini Cert. Ex. D.)

The Escrow Agreement provides that the City, per the May 31, 2013 Contract, was required to deposit $3,000,000 with City National Bank. (*Id.*) The Agreement provides that "except as expressly provided herein or as otherwise agreed to in writing by both an authorized signatory of City, as set forth in Schedule A hereto, and of Zemurray, no one other than the authorized signatories of Zemurray shall have the authority to give City National Bank instructions with

---

[3] The City appears to have only issued a single press release.

respect to the Escrow Fund." (*Id.*) "Schedule A" lists "[n]ames of representatives of the Client authorized to sign instructions given to the Bank." (*Id.*) For the City, the representatives are Mayor Lorenzo Langford and Ronald Cash. Only Drummon is listed as a representative for Zemurray. (*Id.*) Drummon signed the Escrow Agreement on behalf of Zemurray, Mayor Langford signed on behalf of the City, and someone signed on behalf of City National Bank. (*Id.*)

Per the Agreement, Atlantic City Director of Revenue & Finance Michael P. Stinson wired $3 million to the Escrow Account on behalf of the City on August 8, 2013. (Stinson Cert. Ex. B.) The wire instructions state "City National Bank of New Jersey Zemurray Street Capital LLC, Escrow Acct. FBO [For the Benefit Of] City of Atlantic City." (*Id.*) The instructions also stated "payment to establish Mayor's loan pool program." (*Id.*)

### D. The $3 Million Leaves the Escrow Account

An August 12, 2013 email from Thigpen, then-President of TN BIDCO, indicates that he had just spoken to Drummon and that Zemurray was to wire $5 million to TN BIDCO to purchase the company. (Trenk Cert. Ex. R.) TN BIDCO was to then wire funds to a firm representing the TN BIDCO shareholders. (*Id.*) Two weeks later, on August 23, 2013, and fifteen days after the City first wired the $3 million into the Escrow Account, Drummon wired the entire $3 million from the Account to TN BIDCO's account at First Bank in Lexington, Kentucky. (Trenk Cert. Ex. Q.) The City was not told that the $3 million was being transferred from the Account. (Stenson Cert. at ¶ 14.) None of the parties has addressed the discrepancy between Thigpen's anticipated $5 million and the actual transfer of the $3 million.

Also on August 23, 2013, TN BIDCO wired a total of $2,232,686.77 to its law firm. (Trenk Cert. Ex. U.) TN BIDCO's closing statement, dated August 23, 2013, explains the disbursement of the money it received. (Trenk Cert. Ex. T.) $1,535,323 was paid to the shareholders to purchase

all outstanding stock. (*Id.*) $692,363.77 was used to pay off a line of credit with Citizens Tri-County Bank. (*Id.*) $5,000 went to costs and attorneys' fees for the transaction. (*Id.*)

Also on August 23, 2013, TN BIDCO wired $20,000 to Drummon. (Trenk Cert. Ex. U.) TN BIDCO's checking account also shows an August 30 withdrawal of $600,000 which appears to have been placed in an account with Farmers & Merchants Bank. (*Id.*) These sums amount to $2,853,686.77. Some $147,313.23 of the $3 million set aside for the Lending Program is as yet unaccounted for.

The City maintains that it never agreed that any part of the Loan Fund could be used to acquire TN BIDCO, and no representation has been presented to the Court indicating that it assented to the purchase. (Stenson Cert. at ¶ 15.)

### E.  Zemurray's Purchase of TN BIDCO

On May 29, 2014, the Department sent Drummon a letter approving an application by Zemurray to acquire control of TN BIDCO. (Trenk Cert. Ex. W.) However, the Department noted that "Zemurray did not transfer into TN BIDCO's account the capital required in order to implement the proposed plan," but rather used some of the money "to buyout the existing TN BIDCO shareholders." (*Id.*) The Department then noted that "due to the failure of Zemurray to inject the required capital" of $3 million, "the proposed business plan . . . has not been approved." (*Id.*) TN BIDCO did not receive authorization "to conduct any new activity or expansion of products and services as outlined in the proposed business plan." (*Id.*)

Shortly after this, an email from Gary Lax to Thigpen states that he and two other individuals were appointed directors of TN BIDCO at the election of Zemurray, the sole stockholder of TN BIDCO. (Trenk Cert. Ex. X.) On September 5, 2014, Lax presented to the Board of Directors of TN BIDCO a resolution appointing himself as Chairman. (Trenk Cert. Ex. Y.)

Thigpen states that TN BIDCO was never aware of the Lending Program prior to its purchase. (Thigpen Cert. Ex. A.)

### F. Zemurray's Performance under the Contract

Neither Zemurray nor TN BIDCO ever made any loans under the Lending Program or provided financial or loan assistance to any residents or business owners in the City. (Thigpen Cert. at ¶ 18.) The Defendants counter, however, that Zemurray "was in the process of underwriting loans when the City of Atlantic City breached the Contract and demanded the program stop." (Zemurray Resp. SUMF at ¶ 69.) Zemurray has presented the following items that it says prove that it was in the process of underwriting loans:

(1) A press release issued by Mayor Langford's office (Def. Ex. B at 37.);
(2) An October 16, 2013 email between Drummon and Eddie Lax[4] asking about the proper naming of Zemurray Street Capital, LLC. (*Id.* at 38.);
(3) An email chain discussing the same press release, scheduling a conference room, and exclaiming NEWSFLASH in bright bold letters about potential SBA loans relating to the Lending Program (*Id.* at 39-45.);
(4) What appear to be two applications, which may or may not be completed, and which contain pages that are completely inscrutable (Def. Ex. M); and
(5) Another application, which appears to be uncompleted (Def. Ex. N).

The Contract also directed Zemurray to provide quarterly status reports about the Loan Fund to the City. Only one was provided to the City, and only after it was requested. The sole status report given indicates the creation of a website, www.acloanprogram.com, now defunct, and provided a list of total visits to the website from the months of August 2013 through March 2014. (*See* Perugini Cert. Ex. H.) During this time the website received a total of 199,564 hits. That same report also indicates a total of 239 phone calls, and 268 forms submitted, during the same period. It also stated that a Zemurray representative met with 60 residents over this period. Twelve residents prequalified, ten had requests that could not be accommodated, and only three had

---

[4] Related to Gary Lax and the now-dismissed former defendant Michael Lax.

completed the application for an SBA loan. (*Id.*) Despite repeated requests to substantiate this report, no other documentation was provided to the City. (Perugini Cert. at ¶ 39.) This report did not provide an accounting of the Fund or otherwise indicate the status of the money.

Although it was not fully funded within six months of its creation, Zemurray never provided reduced estimates to the City, as also directed by the Contract. (*Id.* at ¶ 40.)

### G. The City Asks for its Money Back and Litigation Ensues

At the end of the third quarter of 2013, the Director of Revenue & Finance and Chief Financial Officer for the City reached out to City National Bank to obtain a bank statement regarding the $3 million. (Stinson Cert. at ¶ 9.) The Bank responded that the $3 million was no longer in the escrow account. (*Id.* at ¶ 10.) This marked the first time the City became aware the $3 million was longer in the account, and the City promptly attempted to locate the funds. (*Id.* at ¶¶ 11-12.) Deputy Solicitor Perugini called Drummon and requested information about the Loan Fund. (Perugini Cert. at ¶ 21.) This conversation was memorialized by email on March 19, 2014, which requested that the funds "remain intact and frozen until which time the City is satisfied that the funds are secure and being used for the purposes set forth in the [Contract]." (*Id.* at Ex. F.) Drummon confirmed receipt, Perugini sent a letter again requesting information, and soon after, on March 24, 2014, Zemurray sent the first and only status report about the Loan Fund, which we have previously described. (*Id.* at Exs. F-H.) Drummon represented shortly after that he had requested that the bank send the City its funds. (*Id.* at Ex. I.)

On March 27, 2014 Perugini emailed Drummon requesting that he call to discuss the status of the funds. (*Id.*) The next day, Perugini again emailed Drummon and stated that the City would not tolerate delay on this matter. (*Id.* at Ex. J.) Drummon called back, the two discussed things, and on April 3, 2014, Drummon sent an email to Perugini stating "Zemurray Street Capital LLC

will take action to restructure its balance sheet to return the Atlantic City Funds as expeditiously as possible." (*Id.* at Ex. K.) In response to a confirmation email from Perugini, Drummon once again stated "Zemurray will expeditiously as possible [sic] to restructure its balance sheet as to return funds to Atlantic City" so to "avoid the cost of litigation." (*Id.* at Ex. L.) Over the coming month, Perugini sent an email and a certified letter and left several voice messages to follow up on this. He did not receive a response. (Perugini Cert. at ¶ 35.)

On May 7, 2014, the City Council adopted Resolution No. 435, authorizing cancellation of the Contract and demanding the return of funds to the City. (Perugini Cert. Ex. O.) Drummon was put on notice of legal action. (*Id.* at Ex. P.)

The City deposed Drummon on April 7, 2014. He testified that at the time of deposition, he had 50% ownership of Zemurray through his ownership of Taipan Holdings, LLC, and that the Lantana Trust owned the other 50%. (Drummon Dep. at 8:7-23.) Drummon also testified that at the time the Contract was signed, the ownership structure was the same. (*Id.* at 14:2-8.) Drummon testified that Zemurray was attempting to purchase TN BIDCO prior to executing the Contract. (*Id.* at 14:14-25.) He also stated that he had used some of the City's $3 million to purchase TN BIDCO:

| | |
|---|---|
| **Q** | Zemurray purchased TN BIDCO? |
| **A** | Yes. |
| **Q** | What did it pay TN BIDCO for the purchase? |
| **A** | $1.3 million I believe. |
| **Q** | Where did that come from? |
| **A** | I believe – |
| **Q** | So the money that Atlantic City gave you, you used to purchase TN BIDCO? |
| **A** | Yes. |

(*Id.* at 15:3-12.) After this, Drummon invoked the Fifth Amendment to each question in his deposition. (*Id.* at 17:10-72:17.) In answering interrogatories, Drummon likewise confirmed that

Zemurray transferred the $3 million to TN BIDCO. (Trenk Cert. Ex. BB at ¶ 5.) Lax, at his deposition and in response to interrogatories, invoked the Fifth Amendment to every question asked of him. (Trenk Cert. Exs. CC, DD.)

To date, the City has not received the $3 million it requested. Zemurray currently has 100% ownership of TN BIDCO. (Pl. SUMF ¶ 113.)

## II.    PROCEDURAL BACKGROUND

This matter first came before the Court when Zemurray removed from the Atlantic County Superior Court on August 19, 2014. After this Court dismissed the first amended complaint's claim under the New Jersey Consumer Fraud Act, Plaintiff filed the second amended complaint ("SAC"). (Doc. No. 93.) The SAC named Zemurray, Drummon, Gary Lax, Michael Lax, the Lantana Trust, and Taipan Holdings as defendants. The parties have since agreed to dismiss Michael Lax from this action. (Doc. No. 135.) This followed the imposition of sanctions on the City. (*See* Doc. No. 119; Doc. No. 121, Tr. at 47:4-8.)

After numerous extensions, discovery has closed and the City has moved for summary judgment. Defendants Zemurray and Drummon oppose this and have filed no other motions. The Lax Defendants oppose the summary judgment on separate grounds, and also request dismissal of Gary Lax under the "law of the case" doctrine. The Zemurray Defendants have also joined in the Lax Defendants' motion to strike a series of exhibits on a multitude of grounds. The Lax Defendants have also filed a cross-motion for summary judgment on the claims against them.

## III.    PROCEDURAL MANEUVERINGS

We deal with the deluge of non-merits arguments first, before considering whether summary judgment is appropriate. The City argues that the Lax Defendants' cross-motion is improper and should be disregarded entirely. The Lax Defendants argue that Gary Lax should be

dismissed under a novel theory that Rule 11 sanctions are merits rulings, and also seek to strike the entirety of the exhibits and certifications attached to the City's motion, along with the City's statement of undisputed material facts. All these requests are denied.

**A.  The Propriety of the Lax Defendants' Cross-Motion for Summary Judgment**

The City argues the Lax Defendants' cross-motion is untimely, pointing to an order by Magistrate Judge Donio that "[t]he Lax Defendants shall file their dispositive motion by no later than 12/9/2016." (Doc. No. 114). However, this Court granted leave to file a cross-motion by May 8, 2017. (Doc. No. 156.) The Lax Defendants filed their cross-motion on May 9, 2017. When the City argues something in its briefing, the Court expects it to be at least plausibly true. This is not, because the Court extended the filing deadline for dispositive motions beyond the date identified by the City. Although it's a day late, the Court will exercise its discretion and hear the cross-motion.

But the Lax Defendants' cross-motion does suffer from some irregularities. The Lax Defendants have asserted numerous arguments on behalf of the Zemurray Defendants, for which they lack standing to assert. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (a litigant generally "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Furthermore, we have previously denied Zemurray and Drummon's motion for summary judgment (*see* Doc. No. 161) on the basis that the Court had already denied a motion for summary judgment filed by Zemurray and Drummon and they had not sought leave to file again. (Doc. No. 145.) We will not permit another attempt at summary judgment in the guise of a co-defendants' motion. The Court will therefore treat the cross-motion as only arguing on behalf of the Lax Defendants.

**B. The Requested Rule 11 Dismissal of Gary Lax**

The last time this Court considered Gary Lax's involvement in this case, it imposed Rule 11 sanctions on counsel for the City because "there was no good faith basis in fact to sue Michael Lax and Gary Lax back in September 2015." (*See* Order, Doc. No. 119; Doc. No. 121, Tr. at 47:4-8.) The parties have agreed to dismiss Michael Lax from this action, and so we only address Gary Lax. The Lax Defendants now argue that the imposition of sanctions means Lax should be dismissed under the Law of the Case doctrine.

"The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Interest Research Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). The doctrine applies "as much to the decisions of a coordinate court in the same case as to a court's own decisions." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816 (1988). The Lax Defendants contend that this Court's previous order imposing sanctions requires the Court to dismiss Lax.

The procedural basis for this request is unclear. We surmise, though, that the Lax Defendants have wrongly conflated a Rule 11 motion for sanctions with a Rule 56 motion for summary judgment. They are quite different. "[T]he imposition of a Rule 11 sanction is not a judgment on the merits of an action." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990). Instead, a Rule 11 motion addresses the conduct of a litigant through a lawyer, not the merits of the case. Our previous order imposed sanctions and did not reach the merits. While a sanctions inquiry and a merits inquiry may run parallel from time to time, they are not on the same track, and for that reason the law of the case doctrine does not apply to these circumstances. As such we decline to dismiss Gary Lax on this basis.

### C. The Motion to Strike

Before directly addressing the motion to strike, we first address the Lax Defendants' numerous arguments in their response to the City's statement of undisputed material facts that many statements and documents presented by the City on summary judgment are inadmissible under the Federal Rules of Evidence. Rule 56 provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," and the Lax Defendants have exercised this right. Fed. R. Civ. P. 56(c)(2). However, a 56.1 statement, responsive or not, "shall not contain legal argument or conclusions of law," and the Court accordingly disregards these arguments where they are not addressed in the briefing. *See* L. Civ. R. 56.1.

We turn to the motion to strike. The Lax Defendants have sought to strike a wide variety of documents in this matter for violations of Rule 26(a). In determining whether "exclusion of evidence is an appropriate sanction for failure to comply with discovery duties," a court looks at:

(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted;
(2) the ability of the party to cure that prejudice;
(3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and
(4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

*Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000). The Third Circuit has supplemented that list, also considering (5) the importance of the excluded testimony and (6) the party's explanation for failing to disclose. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997). The exclusion of critical evidence is, however, "an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894,

904–905 (3d Cir. 1977) (citation omitted). As we explain below, we decline to impose this extreme sanction.

The Lax Defendants argue that the following certifications submitted with the City's summary judgment motion should be stricken, along with their exhibits and anything that references them, for failure to comply with the initial disclosure provisions of Rule 26(a)(1):

(1) The Amended Certification of Deputy Solicitor Michael J. Perugini (Doc. No. 141, ## 31-47);
(2) The Amended Certification of Director of Revenue & Finance/Chief Financial Officer Michael P. Stinson (Doc. No. 141, ## 48-50);
(3) The Amended Certification of Jim Thigpen (Doc. No. 141, ## 51-52); and
(4) The Amended Certification of Arthur Liston (Doc. No. 141, # 53).

The Lax Defendants argue that the City did not disclose "the name, and, if known, the address and telephone number of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses. . . ." Fed. R. Civ. P. 26(a)(1)(A)(i). As a remedy to this alleged nondisclosure, they turn to Rule 37(c)(1), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion." Rule 37 excuses nondisclosure if "the failure was substantially justified or is harmless." *Id.* In addition to this provision, a court may also impose other sanctions, including, as requested here, "striking pleadings in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(iii). The certifications, of course, are not pleadings—they are certifications. But we will nonetheless construe the Lax Defendants' request as one for the exclusion of the certifications under 37(b)(2)(A)(ii), which permits prohibiting a party "from introducing designated matters in evidence" if it has not complied with Rule 26(a).

Before evaluating the arguments against each certification and its associated exhibits, the Court notes that many of the exhibits attached to the certifications were already produced in discovery. We also observe that the Lax Defendants have failed to identify with particularity which

documents are most objectionable. They have also largely failed to demonstrate to this Court what happened (or did not happen) in discovery that has led to this alleged violation of the Federal Rules of Civil Procedure.

### 1. The Perugini Certification

The Lax Defendants argue that Perugini was not involved with this case up until he drafted the original complaint filed in the Atlantic County Superior Court on August 19, 2014. The Court notes that a great deal has happened in this case since the original filing, and that it is reasonable to expect Perugini to have developed some familiarity with the case. The Lax Defendants dispute the scope of his knowledge, however, and assert he lacks personal knowledge and has contradicted his own deposition testimony. Those, however, are disputes of fact, and where they are disputed, the Court has resolved for the nonmovant. What we consider right now, in this paragraph and the next, is whether we should exclude the certification for failure to comply with Rule 26(a). That inquiry does not address whether Perugini has his facts straight. It instead focuses on whether the Lax Defendants were put on notice.

The Lax Defendants have asserted they "were never put on notice" that the City intended to use Perugini as a fact witness. It does appear Perugini was not among those persons in the City's initial Rule 26(a) disclosures. (*See* Doc. No. 148, Ex. A.) The City, however, did indicate in this same disclosure that the listed individuals "are not limited to the following." Given the circumstances, that could be insufficient. In any event it is here beside the point: the Lax Defendants were plainly aware of Perugini. They deposed him on February 10, 2016. That puts to rest any concern that Defendants were inadequately aware of his involvement in this case. Rule 26 does not require supplementation of disclosures if the information has "otherwise been made known to the other parties during the discovery process or in writing." *Veverka v. Royal Caribbean*

*Cruises Ltd.*, 649 Fed. App'x 162, 166 (3d Cir. 2016). And because the Lax Defendants had notice of Perugini, his certification falls within the scope of Rule 37's "harmless error" exception for non-disclosures. The motion to strike the Perugini certification is therefore denied.

### 2. *The Thigpen Certification*

The Lax Defendants argue that the City has likewise "hidden" Thigpen from them and that his certification should be excluded under the same lines of argument advanced as to Perugini. Once again, the City did not list Thigpen in its Rule 26(a) initial disclosure. But the Lax Defendants had received a tranche of documents from Thigpen. (Doc. No. 140, Ex. A.) The Lax Defendants had also represented that they wanted to depose Thigpen. (Doc. No. 139 at 2.) And in any event to say Drummon, who negotiated with Thigpen, did not receive notice of Thigpen's role in this transaction is absurd. Rule 26(a) requires that the opposing party be given fair notice; it does not require a party to lead its opponent to chapter and verse and advocate on its behalf. The Lax Defendants had fair notice. We therefore deny the motion to strike the Thigpen certification.

### 3. *The Stinson and Liston Certifications*

Although both Stinson and Liston are clearly listed in the City's Rule 26(a) initial disclosure, the Lax Defendants have not articulated with any particularity why this Court should strike these certifications. Neither will we.

## D. The City's 56.1 Statement of Undisputed Material Facts

The Lax Defendants argue that the City has failed to file a statement of undisputed material fact that conforms with Local Civil Rule 56.1. They ask the Court to adopt their statement instead. The Lax Defendants' argument distills to the claim that the City's 56.1 statement is so "riddled" with improper arguments, conclusory statements, and Rule 26 violations that the Court should strike it. We disagree. The City's 56.1 statement sets forth its version of the facts with relative

felicity. If it is unfortunately the case that a statement occasionally does not bear a clear relationship to the record, or if it makes a legal argument, or if it is contradicted by another superseding fact such as a prior deposition, the Court may, at its discretion and in the light most favorable to the nonmovant, treat the "fact" as undisputed or disregard it. *See* L. Civ. R. 56.1. But there is no defect within the City's statement so serious as to warrant striking it entirely.

Indeed if any party here has wantonly disregarded Local Civil Rule 56.1 it is Defendants, whose responses to the City's Statement of Undisputed Material Fact consist mostly of disputations bereft of disputes. Thus are matters of public record assailed as inadmissible due to the lack of personal knowledge of the City Deputy Solicitor. (*See, e.g.*, Zemurray Resp. SUMF ¶ 25.) Letters written by Drummon are disputed as a violation of Rule 26(a) because Drummon had no notice that he himself wrote the letters. (*Id.* at ¶¶ 22, 39.) Express, quoted language in the Contract is denied because it does not quote other parts of the Contract. (*Id.* at ¶ 30.) Or else the language is disputed by omitting vital parts of the very same sentence. (*Id.* at ¶ 42.) Perhaps tellingly, Defendants have not explained how quoted language is factually disputable solely because there is other language in the Contract. But no explanation is needed. Some facts are just facts. Whatever the case, a 56.1 statement is no place to make these arguments.

Thus we will not, as requested, strike the entirety of the City's 56.1 statement. What errors exist are comparatively venial. We proceed to the merits.

## IV.    THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x. 353, 354 (3d Cir. Sept. 17, 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## V. BREACH OF CONTRACT (COUNT ONE)

The City has moved for summary judgment for breach of contract on essentially three separate theories. First, the City argues Zemurray failed to take action in furtherance of the Lending Program, which the City contends the Contract required it to do. Second, the City argues the transfer of the $3 million was not permitted under the Escrow Agreement. Third, the City argues that Zemurray breached by failing to comply with the reporting obligations imposed by the Contract. The Lax Defendants, on their cross-motion for summary judgment, argue that the claims for breach of contract must be dismissed as to Gary Lax, the Lantana Trust, and TN BIDCO because none were parties to the Contract.

The agreement between Zemurray and the City is of two parts: the May 31, 2013 Contract, and the subsequent Escrow Agreement. The law of New Jersey applies to the Contract and the law of New York applies to the Escrow Agreement.

Under New Jersey law, the City bears the burden of showing (1) the parties entered into a valid contract; (2) Zemurray failed to perform its obligations under the contract; and (3) the City sustained damages as a result. *See Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007). As neither party denies the validity of the Contract, the Court will examine whether Zemurray breached its terms. The Court also observes that the Contract contains an integration clause that states the Contract "supersedes any and all prior agreements, written communications or understanding between the parties." An integration clause will not bar evidence of prior agreements needed to interpret ambiguous terms, *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 233 (3d Cir. 2001), but unless it is necessary to resolve such an ambiguity the Court will not consider prior negotiations or discussions.

A court enforces contracts "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*, 226 N.J. 403, 415 (2016) (citations and internal quotations omitted). When "the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect." *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014). But "[w]hen the provision at issue is subject to more than one reasonable interpretation, it is ambiguous, and the 'court may look to extrinsic evidence as an aid to interpretation.'" *Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 224 N.J. 189, 200 (2016) (quoting *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008)).

If during the course of performance one party fails to perform essential obligations under a contract, it may be considered to have committed a material breach and the other party may elect to terminate. *See Frank Stamato & Co. v. Lodi*, 4 N.J. 14, 21 (1950); *Medivox Prods., Inc. v. Hoffmann-LaRoche, Inc.*, 107 N.J. Super. 47, 58–59 (Law. Div. 1969). "A breach is 'material' if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract." 23 Williston on Contracts § 63:3 (4th ed.).

Although questions of materiality are not always apt for summary judgment, "in certain situations, it can be appropriate to determine the issue of material breach at the summary judgment stage." *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 93 (3d Cir. 2008). Those situations arise when "the materiality question in a given case admits of only one reasonable answer." *Id.* (citing *Gibson v. City of Cranston*, 37 F.3d 731, 736 (1st Cir. 1994)).

### A. Zemurray's Use of the Funds

The City first argues that Zemurray materially breached the Contract by failing to implement the Lending Program and by using the money to purchase TN BIDCO. As always, we begin with the express terms of the Contract. "[Zemurray] will oversee the implementation of the Loan Fund and will use TN [BIDCO] to lend the monies in the Loan Fund." By the plain language of the Contract, the intent of the parties was to establish a Loan Fund for small business owners, residential loans, and rehabilitation and development projects. Because the Contract is replete with undefined terms, it has occasioned many disputes about its interpretation, particularly about "implement" and the "use" of TN BIDCO.

We first consider the scope of the obligation imposed by the Contract on Zemurray. Zemurray takes the position throughout its papers that it had the "unfettered" ability to dispose of the funds however it saw fit. This perspective is consistent with its arguments that it had free rein to buy TN BIDCO, an issue we take up below. For the argument that its discretion to use the funds was unfettered, Zemurray largely relies on a sentence in the Escrow Agreement stating "no one other than the authorized signatories of Zemurray shall have the authority to give City National Bank instructions with respect to the Escrow Fund." This reading is far too broad. First, that very same sentence is qualified with "except as expressly provided herein" in "Schedule A" to the Agreement, which clearly indicates Mayor Langford and Ronald Cash of the City had the authority to "sign instructions given to the Bank." This implies at least some degree of joint management of the Fund. We thus do not read the agreement between the parties to confer "unfettered" discretion to Zemurray. But more importantly, the fact that Zemurray had the authority to instruct the Bank on the use of the Fund does not imply it had "unfettered discretion." A right to use does not imply a right to misuse. Reasonableness serves as the guardrail of meaning in these circumstances. In

interpreting the Contract, we look to objective manifestations of the parties' intent, not the parties' subjective intentions themselves. *Mellon Bank, N.A. v. Actna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980). Even without reference to extrinsic evidence of the parties' intentions, the Contract clearly contemplated using the funds for the Lending Program. This does not suggest "unfettered" discretion; it suggests instead that Zemurray's considerable discretion was fettered to the purposes of the Contract.

*1.* *"Implementation" of the Lending Program*

As we find Zemurray's obligations are subject to the bounds of reasonableness, not whatever it wanted to do, we turn to the City's argument that the Lending Program was never implemented. It is undeniable that little happened. No evidence has been presented to this Court indicating any application was ever actually processed. No evidence has been presented indicating any loan was ever actually made. The City argues that this shows Zemurray breached the Contract. Zemurray's primary argument in response is feeble: the Contract stated that only the City could publicize the Loan Fund, and that is why so little happened. But nothing in the Contract indicates the processing of loan applications is contingent on an advertising campaign by the City.

Yet insofar as Zemurray failed to perform its obligations to "implement" the Contract, this Court must take the facts in the light most favorable to Zemurray. It may well be that nothing ever happened because the situation on the ground was amenable to nothing ever happening. Zemurray's sole status report lends credence to this conclusion. It indicates some headway was made in establishing the Lending Program. The Lending Program website, www.acloanprogram.com, received a total of 199,564 hits and 81,206 visits. We do not know if those numbers are an effective measuring tool—they far exceed the population of Atlantic City itself, casting some doubt on their significance. But that same report did state that 239 calls were

made from August 2013 to March 2014, and that 268 forms were submitted for consideration. It stated that a Zemurray representative met with 60 residents of the City. Of these residents, 10 were seeking unrelated assistance, 12 were prequalified, and 3 ultimately completed an application. If only three applications were ever completed, the fact that no loans were ever made or even processed is unremarkable. The Contract obliged Zemurray to oversee implementation of a Lending Program. It did not oblige Zemurray to loan money to anyone who applied for it. The City thus vastly overstates the significance of no loans ever being processed or made. Taking the status report's representations as true, it appears Zemurray did implement some sort of Lending Program. The fact that it never made a loan does not prove it did not try.[5] In the light most favorable to Zemurray, the facts suggest Zemurray did perform its minimal obligation to "oversee the implementation" of a Lending Program.

    2.  *The Meaning of "use TN [BIDCO]"*

    We next consider the City's argument that using the $3 million to purchase TN BIDCO is itself a breach of contract. The trail of the money in this case generally does not lead to the implementation of a Lending Program in Atlantic City—even it was established—but to some entities in Tennessee and elsewhere. The majority of the $3 million deposited in escrow was used to buy TN BIDCO. $1,5235,323 was paid to TN BIDCO shareholders for their stock. $692,363.77 went to pay off a TN BIDCO line of credit. $20,000 went to Drummon. $5,000 went to attorneys' fees. Another $600,000 ended up with Farmers & Merchants Bank. $147,313.23 is apparently

---

[5] The City has challenged the accuracy of the status report and the emails corroborating meetings with applicants, arguing (correctly) that arranging to do something is far different from actually doing something. But on summary judgment "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255 (1986). We must infer from the evidence available that Zemurray met with the applicants, not the opposite.

unaccounted for. Zemurray has declined to shed any light on where this went. The City argues that this situation constitutes a breach.

The City maintains it never agreed that the money would be used to buy TN BIDCO, and argues, in essence, that Zemurray's purchase of TN BIDCO is inconsistent with the language in the Contract concerning "use" of TN BIDCO. At first blush we see no inconsistency between the Contract's language and the purchase of TN BIDCO. Sometimes you buy a shovel before you use it. That does not prevent use of the shovel—often, it facilitates use. On the face of the Contract, then, the terms of the Contract itself do not say Zemurray could not buy TN BIDCO to "use" it. However, the City also argues (in so many words) that the term "use" is ambiguous, because the City had previously been told that Zemurray would "contract with" TN BIDCO in a prior investment proposal. They argue the Contract should not be understood as permitting Zemurray to buy TN BIDCO. This presents a dispute about the meaning of "use," and thus the Court must determine what the parties intended when they agreed that "Zemurray . . . will use TN [BIDCO] to lend the monies in the Loan Fund." However, the Contract contains an integration clause, which states unambiguously that the Contract "supersedes" all prior understandings, potentially barring consideration of the prior investment proposal and other documents. Thus, before the Court can evaluate extrinsic evidence to determine the meaning of "use," the Court must consider whether it can do so under the parol evidence rule.

In general, the parol evidence rule "prohibits the introduction of evidence that tends to alter an integrated written document." *1 Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 901 A.2d 341, 346 (N.J. 2006). However, the New Jersey Supreme Court does not strictly apply the parol evidence rule. *See Atl. N. Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 96 A.2d 652, 655–56 (N.J. 1953). Under New Jersey law, courts should "consider all of the relevant evidence that will assist

in determining the intent and meaning of the contract." *Conway*, 901 A.2d at 346. This requires "a thorough examination of extrinsic evidence in the interpretation of contracts." *Id.* "Such evidence may include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." *Id.* (internal quotation marks and citations omitted). But notwithstanding this relaxed approach to the parol evidence rule, the New Jersey Supreme Court has held:

> The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said.

*Schwimmer*, 96 A.2d at 655–56. A court should therefore exclude parol evidence "[s]o far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing." *Id.*

We note that the integration clause "supersedes," i.e., it states it supplants inconsistent (but not necessarily consistent) understandings between the parties. We also note that Zemurray's prior statement in its investment proposal that it would "contract with" TN BIDCO is not superseded by the term "use." Rather, this term sheds light on the meaning of the very generic term "use," and does not conflict with the Contract itself. We note further that although "use" is an exceptionally broad term that encompasses both purchasing an entity and contracting with an entity, those concepts are typically exclusive of each other. If someone contracts with a company, they do not buy a company; if someone buys a company, they do not contract with it. Because the parties treat the scope of "use" so differently, the term thus presents an ambiguity that the Court must resolve to determine breach.

In light of these considerations, neither the integration clause nor New Jersey's relaxed application of the parol evidence rule prevent this Court from evaluating past understandings between the parties to divine the meaning of "use TN BIDCO" in the Contract. The most significant evidence available of the understanding between the parties is found in Zemurray's representations to the City that it would "contract with" TN BIDCO. That proposal led to the Contract. It may be argued that reading "use TN BIDCO" as "contract with" is much more consistent with the other terms of the Contract than "buy" would be. And there is likewise nothing in the record to suggest the parties contracted to buy TN BIDCO. Thus consideration of extrinsic evidence like the investment proposal lends some support to the conclusion that Zemurray breached by using the funds the way it did—but on summary judgment, the Court cannot weigh the significance of this extrinsic evidence.

Although it is often a difficult matter to distinguish when the interpretation of a contract is a matter of law or a matter of fact, the State of New Jersey has made clear that the intent of the parties—as opposed to the construction of the document itself—is a jury question. *See Woodhaven Lumber & Millwork, Inc. v. Monmouth Design & Dev. Co.*, 2014 WL 1326994, at *6 (N.J. Super. Ct. App. Div. Apr. 4, 2014) ("If the meaning of an ambiguous provision depends upon the resolution of factual disputes, then the meaning of the doubtful provision is itself a question of fact."); *City of Long Branch v. Anzalone*, 2008 WL 3090052, at *23 (N.J. Super. Ct. App. Div. Aug. 7, 2008) ("When the construction of the documents turns on the meaning of the extrinsic evidence, that meaning must be determined as a question of fact rather than of law."). That is especially so for "latent ambiguities," such as the meaning of "use TN [BIDCO]," which "are subjects for the consideration of a jury and may be explained by parol evidence." *Franklin K. Pearce Co. v. Beverly Beac*h, 107 N.J.L. 73, 75–76, 150 A. 399, 400 (1930). *See also Hofer v.*

*Carino*, 4 N.J. 244, 250, 72 A.2d 335, 338 (1950) (finding latent ambiguities in a deed required consideration of extrinsic evidence that was a question of fact for the jury).

The parties hotly dispute the meaning of the term "use TN [BIDCO]." The extrinsic evidence presented by the City is suggestive of a meaning along the lines of "contract with," and Zemurray has presented little aside from its *post hoc* understandings that could suggest another reading. But ultimately the meaning of the term "use TN [BIDCO]," evaluating and weighing the extrinsic evidence available, is one for a jury to decide. We thus do not grant summary judgment for breach of contract under the theory of improperly using the funds.

### B. The Transfer out of the Escrow Account

The City argues that transfer of the $3 million out of the Escrow Account was not permitted under the Escrow Agreement. The Agreement required the City to deposit up to $5 million, of which $3 million was to be deposited immediately. Both the City and Zemurray had the authority to instruct City National Bank, the escrow agent, on how to use the Fund. If the Bank received written instructions from Zemurray, it was to disburse "all of the funds" within three days. The Contract between the City and Zemurray required that "[t]he monies held in the escrow account will be used to establish the Loan Fund." It also required return of the money within 30 days of the end of the five-year term. Ultimately, the City deposited the $3 million, and Zemurray immediately withdrew it.

New York law governs the Escrow Agreement. An escrow is a written agreement that legally obliges a promisor to deposit property with a third party, who keeps it in the capacity of escrowee until a condition is met. *Nat'l Union Fire Ins. Co. Pittsburgh, Pa. v. Proskauer Rose Goetz & Mendelsohn*, 165 Misc. 2d 539, 544, 634 N.Y.S.2d 609 (Sup. Ct. 1994), *aff'd* 227 A.D.2d 106, 642 N.Y.S.2d 505 (1996). "The purpose of an escrow is to assure the carrying out of an

obligation already contracted for and in furtherance of the obligation the promisor deposits money, goods, or documents to an escrow agent who agrees to part with it only on a specified condition." *Id.*

There is nothing in the Contract or the Escrow Agreement that indicates transfer of the $3 million out of the account is in and of itself breach of the Contract. Indeed, the Contract envisioned a scenario in which Zemurray would contract with TN BIDCO to administer the Lending Program. If Zemurray could use TN BIDCO under the Contract, then it follows that Zemurray could transfer funds out of the Loan Fund to TN BIDCO, for there would otherwise be no other way for TN BIDCO to administer the funds. So the argument, repeated over and over again throughout this litigation, that Zemurray could not transfer anything out of the Fund under the Contract, is flatly contradicted by a straightforward application of the Contract's terms. We therefore do not agree that Zemurray breached the Contract simply by transferring the money out of the escrow account.

### C. The Reporting Requirements

The City last argues that Zemurray failed to perform its reporting obligations. Under the terms of the Contract, Zemurray would "provide the Mayor's Office within forty-five (45) calendar days after end of each calendar quarter with a report setting for [sic] the use of the monies in the Loan Fund for the lending purposes set forth" in the Contract. Only one status report was ever provided to the City. This report did not set forth the use of the monies in the Loan Fund. This alarmed the City and led to the current litigation. No other status reports were ever provided.

After discovering that the $3 million had left the escrow account, the City asked Zemurray about its status, and the report provided to the City was not responsive to where the money went. That the City had to ask is itself a problem under the Contract, for it provides that Zemurray would provide quarterly updates to the City. On the record before this Court, this happened once in the

time from the May 31, 2013 execution of the Contract to the onset of this litigation a year later, at which point the City rescinded its Contract arguing breach. The Contract imposed few obligations on Zemurray, and chief among them was to tell the City what was going on with the money. This is an essential obligation under the Contract—as a general matter, people expect the managers of their money to respond promptly to inquiries about it. That is especially the case where, as here, the parties agreed to such updates. The City asked for this. Zemurray failed to do it. And it also failed to provide a reduced estimate for aggregate lending under the Loan Fund in compliance with another term of the Contract.

Considering Zemurray's failure to comply with its reporting obligations, the Court concludes that on the undisputed record before it, Zemurray failed to perform essential obligations under the Contract. Summary judgment is therefore appropriate for breach of contract for failure to comply with the Contract's reporting obligations, and the City's motion is granted as to this claim against Zemurray. However, the City's motion is denied as to Drummon and the Lax Defendants because they are not parties to the Contract.

### D. Dismissal of Non-Parties to the Contract

The Lax Defendants have moved for summary judgment on the breach of contract claims against them. None of the Lax Defendants were parties to the Contract at issue here, and cannot be liable for breach of contract. *See Implicito*, 392 N.J. Super. at 265. We therefore grant the Lax Defendants' motion for summary judgment as to this claim for Defendants Gary Lax, the Lantana Fund, and TN BIDCO.

## VI.  THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT TWO)

### A. Zemurray's Alleged Bad Faith

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001). Although it cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate an express term. *Id.* "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Id.* (citing Restatement (Second) of Contracts § 205 comment a (1981)). A party claiming a breach of the covenant of good faith and fair dealing "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005) (citing 23 Williston on Contracts § 63:22, at 513-14 (Lord ed. 2002)). "As a general rule, '[s]ubterfuges and evasions' in the performance of a contract violate the covenant of good faith and fair dealing 'even though the actor believes his conduct to be justified.'" *Id.* (citing Restatement (Second) of Contracts, § 205 comment d (1981)). However, "[w]ithout bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 773 A.2d 1121, 1130 (N.J. 2001).

We note at the outset that the City's moving papers speak in sweeping terms about the breach of this implied covenant and that it is difficult to determine with particularity what actions are attributable to bad faith. The SAC provides little assistance on this point as well. We also note that Zemurray's decision not to disclose that it was negotiating with the Tennessee Department of Financial Institutions does not by itself suggest bad faith. Businesses are generally under no compulsion to reveal advantage; "[w]hen there is no fiduciary duty or special relationship between parties, there is no affirmative duty to disclose." *Harvey v. Nissan N. Am., Inc.*, 2005 WL 1252341, at *4 (N.J. Super. Ct. Ch. Div. Apr. 29, 2005) (citing *United Jersey Bank v. Kensey*, 306 N.J. Super. 540 (App. Div. 1997)). Prior to assuming control of the $3 million, Zemurray was not a fiduciary. Its silence about its alleged machinations, at least then, was permissible.

That said, the City argues it had the reasonable expectation that Zemurray would use the Loan Fund in furtherance of the Lending Program. "[N]ot one dollar" was ever used for any purpose relating to the Lending Program, the argument goes, and that "therefore deprived the City of the benefits it bargained for under the Contract." (Def. Br. at 11.) This, however, does not demonstrate the bad faith needed to show breach of the implied covenant. When the City first learned from City National Bank that the $3 million was no longer in the account, Director of Revenue and Finance Perugini contacted Drummon to ask what had happened. After some back and forth, he received no concrete answer. Instead, Zemurray sent a status report that made no mention whatsoever of the status of the money. The City sought substantiation; none was provided. We have already noted the failure of Zemurray to provide quarterly status reports as per the Contract; "community standards of decency" would require providing some accounting of the City's money, particularly after failing to provide contractually-required updates. But while non-

conformance with decency and common sense can suggest bad faith, we are to make all reasonable inferences in favor of the nonmovant on summary judgment.

Ultimately, the record does not establish that Drummon, acting on behalf of Zemurray, had acted with "ill motives and without any legitimate purpose." *Brunswick*, 864 A.2d at 396. Much of what can be explained by malice is equally explained by ignorance, mistake, or confusion. This deal was inked on a contract less sophisticated than a pizza parlor job application.[6] That the parties subsequently had difficulties on the follow-through is unsurprising. It is eminently plausible to this Court that Zemurray thought it could get clearance to use TN BIDCO for the Lending Program and did not, or squandered the money after setting up the rudiments of an apparently-failed Lending Program, or simply had no idea what it was doing. Whatever the case, the City has not met its burden in proving Zemurray acted in bad faith in performing its loosely-defined obligations under the Contract. There are other explanations, many of them unflattering, but still sufficient for this Court to deny the City's motion for summary judgment as to this claim against Zemurray. The City's motion is also denied as to Drummon and the Lax Defendants because they are not parties to the Contract.

### B. Dismissal of Non-Parties to the Contract

The Lax Defendants have moved for summary judgment on the breach of the implied covenant claim against them, which is "implied in every contract in New Jersey." *Wilson*, 168 N.J. at 244. None of the Lax Defendants were parties to the Contract at issue here, and therefore they

---

[6] This is descriptive; it is not meant to be facetious. At three pages, with virtually no terms defined, with basically no plan for the implementation of the agreement save the use of the word "implement" and some lines indicating TN BIDCO would be used, the parties' choice to rely on this document to govern the use of millions of taxpayer dollars is, at best, questionable.

cannot be liable under this count. We thus grant the Lax Defendant's motion for summary judgment as to this count for Defendants Gary Lax, the Lantana Trust, and TN BIDCO.

## VII.  TORT AND VEIL-PIERCING CLAIMS

Although the parties have not raised this issue, the Court notes that under New Jersey law, "a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316, 788 A.2d 268, 280 (2002). The parties agree that the Contract governs the relations between them. Yet the City has brought tort claims of fraud, fraudulent concealment, and conversion against the Defendants. As a preliminary matter, the Court must examine whether those claims arise from a contractual relationship. If so, they must be dismissed.

### A. Fraudulent Concealment (Count Eight)

The claim for fraudulent concealment does not arise from the Contract, as the City alleges evidence was destroyed in relation to this litigation. The City has not moved for summary judgment on this claim, but the Lax Defendants seek dismissal of it. Although the City effectively left the cross-motion unopposed on the merits, the Court is still bound to determine whether summary judgment is appropriate. The tort of fraudulent concealment has the following elements:

(1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;
(2) That the evidence was material to the litigation;
(3) That plaintiff could not reasonably have obtained access to the evidence from another source;
(4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation; and
(5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Rosenblit v. Zimmerman*, 166 N.J. 391, 406–07, 766 A.2d 749, 758 (2001). The City has not alleged with any particularity how this concealment occurred, nor has it pointed to any evidence

supporting its claim. In other words, it is groundless suspicion. That is not enough, and the Lax Defendants' motion is granted as to this claim.

### B. Conversion (Count Four)

We turn to the conversion claim. In New Jersey, the elements of the common-law tort of conversion are (1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant. *Corestar Int'l Pte. Ltd. v. LPB Commc'ns, Inc.*, 513 F. Supp. 2d 107, 127 (D.N.J. 2007). "The crux of conversion is wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property." *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 456, 978 A.2d 281, 288 (App. Div. 2009). The only conceivable basis for conversion is that Zemurray has retained the $3 million given to it after breaching the Contract. That, of course, "arise[s] from a contractual relationship," and as there is no "independent duty imposed by law," the Court denies the City's motion for summary judgment against all Defendants, and grants the Lax Defendants' cross-motion because the remedy is breach of contract. *Saltiel*, 170 N.J. at 316.

### C. Fraud (Count Three)

The Court now turns to the fraud claims brought by the City. We note that the SAC appears to enumerate two separate theories: that the City was "induced to select Zemurray, Drummon, and BIDCO instead of another company," i.e. fraud in the inducement, and a fraud predicated on "Defendants['] failure to report and account for the funds and to refund the [ ] sum," i.e. fraud in the performance. Fraud in the performance is fraud arising from a contractual relationship, and we thus deny the City's motion and grant the Lax Defendants' cross-motion to the extent this claim is brought against them for fraud in the performance. *See Unifoil Corp. v. Cheque Printers &*

*Encoders Ltd.*, 622 F. Supp. 268, 271 (D.N.J. 1985) (dismissing claim for fraud in performance for arising from contract).

We turn to the City's theory that Zemurray induced it to select it for the Contract by false representations. In New Jersey, the five elements of the tort of common law fraud are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; (5) resulting damages." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 526 (D.N.J. 2008).

Zemurray made two misrepresentations relevant to a claim of fraud in the inducement. First, and as we noted above, the purchase of TN BIDCO is inconsistent with Zemurray's prior representations that it would "contract with" the entity. Second, Drummon, on behalf of Zemurray, also represented that TN BIDCO could originate residential mortgages despite its apparent inability to do so. Although the Court does not know whether the Department's assessment that TN BIDCO could not originate loans is correct, the Court has no reason to believe the Department was wrong.

Zemurray misrepresented that it would "contract with" TN BIDCO but subsequently went forward to purchase it. We agree that Zemurray planned to purchase TN BIDCO; Drummon has admitted as much. What is less clear is that the Defendants planned to purchase TN BIDCO in knowing violation of the Contract with the intent of inducing the City into the Contract. The fact that the City did not know about Zemurray's negotiations with other entities is of no import—"there is no affirmative duty to disclose" such facts, and the City has not met its burden in proving the complicated scheme it alleges occurred. *Harvey*, 2005 WL 1252341, at *4. That scheme boils down to an allegation that Defendants induced the City to enter the Contract so that they could

purchase TN BIDCO and make off with the $3 million while at the same time risking a lengthy lawsuit. That could be, but "Occam's razor posits that as between two competing theories, the simpler explanation is likely correct." *Grelu Consulting, Inc. v. Patel*, 2013 WL 2435348, at *3 (N.J. Super. Ct. App. Div. June 6, 2013). Of the explanations available for what happened here, human error is at least as compelling an explanation as fraudulent intent.

We likewise decline to infer fraudulent intent from the Defendants' misrepresentations about TN BIDCO's ability to originate residential loans. We first note that the Contract is, as ever, unclear on the precise nature of TN BIDCO's involvement in this transaction, but based off the statements of Drummon it appears the parties contemplated that TN BIDCO would be "lending." The record is clear that TN BIDCO could not originate residential loans; that Drummon knew, because he was told, that it could not originate residential loans; and that Zemurray went ahead and contracted with the City despite this. The City also asks this Court to make an adverse inference based off certain gaps in proving the alleged fraudulent scheme. *See S.E.C. v. Graystone Nash, Inc.*, 25. F.3d 187, 190 (3d Cir. 1994). But Drummon's decision to take the Fifth Amendment is neither irregular nor indicative of his involvement in the scheme alleged by the City. We decline to make such an adverse inference in the absence of other evidence that is strongly suggestive of his intent to defraud the City. Once again the Court finds that mistake can easily explain the conduct of Defendants. The fact that the Lending Program envisioned by the parties fell apart spectacularly does not prove Defendants intended that to happen. On summary judgment, the Court will not infer subjective intentions from objective consequences. The City's motion is thus denied as to the fraud claims against Zemurray and Drummon.

The Court will, however, grant the Lax Defendants' cross-motion for summary judgment on the fraud claims. The Federal Rules of Civil Procedure require a plaintiff to state with

particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* The only thing tying the Lax Defendants to this litigation is, in the case of Lax and the Lantana Fund, their interest in Zemurray, and in the case of TN BIDCO, its status as a subsidiary of Zemurray. Mere involvement with a person or entity accused of fraud does not comply with Rule 9(b)'s requirement that fraud be alleged with particularity. But even if the Court ignored this procedural defect, there is virtually no evidence to support an inference of fraudulent intent on the part of the Lax Defendants. At the prior Rule 11 hearing in this case, this Court previously commented on the paucity of the evidence brought against the Lax Defendants. As we have noted, that was not a merits ruling, but the insufficiency of the evidence is as much a problem now as it was then. The Lax Defendants are tied up in this case solely by virtue of their relationships to Zemurray as shareholders or as purchased entities. Nothing has been presented indicating they were involved in any fraudulent scheme. Nor does Lax's decision to plead the Fifth Amendment, a decision this Court previously noted at the Rule 11 hearing noted was rational. To make an adverse inference from Lax's silence would be tantamount to inferring the entire case against him. That will not lie, and we therefore deny the City's motion for summary judgment against all Defendants and grant summary judgment for the Lax Defendants with respect to this claim.

### D. Veil Piercing (Count Six)

Because the Court denies summary judgment on the City's fraud claims, the Court likewise denies it on the veil-piercing theory advanced by the City. Under New Jersey law, a plaintiff may state a claim for piercing the corporate veil by showing: "(1) one corporation is organized and operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to

circumvent the law." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 171–72 (3d Cir. 2002) (citing *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 149 (3d Cir. 1988)). The relevant factors in this inquiry include:

> gross undercapitalization . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of the funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders.

*Id.* (quoting *Am. Bell, Inc. v. Fed'n of Tel. Workers,* 736 F.2d 879, 886 (3d Cir. 1984)).

The City has not met its burden in showing that Zemurray is abusing corporate formalities. The City has not alleged with any particularity any of the factors enumerated above, and has only asserted that Defendants owned and controlled Zemurray. Simply showing ownership falls far short of showing the disregard of corporate formalities, as business entities are formed for the very purpose of insulating individual owners and related companies from liability. *See New Jersey Dept. of Env. Protection v. Ventron Corp.*, 94 N.J. 473, 500 (N.J. 1983). We thus deny the City's motion for summary judgment as to this claim against all Defendants, and grant the Lax Defendants' cross-motion as to this claim.

## VIII.   FRAUDULENT TRANSFER CLAIM (COUNT SEVEN)

### A.  Zemurray and Drummon

The City has also brought a claim under the Uniform Fraudulent Transfer Act ("UFTA"), codified at N.J. Stat. Ann. 25:2-25(a). The City argues Defendants transferred money from the Loan Fund to City National Bank and thereby defrauded the City. As relevant:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

41

N.J. Stat. Ann. 25:2-25(a).

This provision only applies to debtors and creditors. Under the statute, "creditor" is "a person who has a claim"; "debtor" is "a person who is liable on a claim"; "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *See* N.J. Stat. Ann. 25:2-21. New Jersey courts have read the UFTA broadly. "The UFTA does not prevent a present or future 'creditor' from seeking a remedy prior to judgment. In other words, a defendant need not be a 'debtor' *before* plaintiff asserts a UFTA cause of action." *Intili v. DiGiorgio*, 300 N.J. Super. 652, 659 (Ch. Div. 1997) (emphasis in original); *Lange v. Semanske*, 108 N.J. Eq. (Ch. 1931) (widow and children having claim for wrongful death are "creditors" of tortfeasor). *See generally* 15A Fletcher Cyc. Corp. § 7408 (outlining common examples of fraudulent transfers under the UFTA and noting its application to present or anticipated future creditors).

But despite these courts' broad interpretations, this Court is skeptical that any of the parties stand in a creditor-debtor relationship. Even the most expansive interpretation of the term "creditor" would require this Court to reach the conclusion that Zemurray's transfer of $3 million, done immediately after receipt of the monies, was made to escape liability in anticipation of a claim arising from a future judgment against the transferor. Such a broad view would be so expansive as to render virtually any transfer of property, later subject to dispute, as one that leads to a claim establishing a creditor-debtor relationship. That interpretation seems far beyond the scope of the UFTA. But the Court need not reach that question today.

Liability under the UFTA requires demonstration of an "actual intent to hinder, delay, or defraud" the City. As we have noted with regard to the allegations of bad faith and fraudulent

intent, the facts here do not foreclose a question of fact for the jury on what Zemurray and Drummon's intentions were. On summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 248. The wide range of possible explanations forecloses a conclusion on summary judgment of fraudulent intent under the UFTA. Taking the facts in the light most favorable to the nonmovant, the Court denies the City's motion on this claim as to Zemurray and Drummon.

### B. The Lax Defendants

As we have noted repeatedly with regard to the Lax Defendants, an allegation of sweeping conspiracy is insufficient to prove an intent to defraud. For essentially the same reasons above, the Court will grant the Lax Defendants' motion for summary judgment as to the fraudulent transfer claims.

### IX. CONSTRUCTIVE TRUST AND PUNITIVE DAMAGES

We have denied summary judgment for the tort claims, and will thus not consider the propriety of punitive damages at this time. *See Nappe v. Anschelewitz, Bar, Ansell & Bonello*, 97 N.J. 37, 49-51 (1984). We similarly decline the request for this Court to establish a constructive trust. "Generally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property." *D'Ippolito v. Castoro*, 51 N.J. 584, 589, 242 A.2d 617, 619 (1968). At this time, we do not find that a "wrongful" act has occurred.

**X.      CONCLUSION**

For the reasons stated herein, the City's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and the Lax Defendants' motion for summary judgment is **GRANTED** in its entirety. An order follows.


Dated:    12/29/2017                                    /s Robert B. Kugler
                                                        ROBERT B. KUGLER
                                                        United States District Judge